IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § § | EP-18-CR-3530-PRM |
| RICARDO RAMIREZ, JR., Defendant. | § § § | |

## MEMORANDUM OPINION AND
## ORDER DENYING MOTION TO SUPPRESS

On this day, the Court considered Defendant Ricardo Ramirez, Jr.'s [hereinafter "Defendant"] "Motion to Suppress Evidence" (ECF No. 31) [hereinafter "Motion"], filed on April 8, 2019; the Government's "Amended Response to Defendant's Motion to Suppress" (ECF No. 35) [hereinafter "Response"], filed on April 29, 2019; the testimony offered at the Suppression Hearing held on June 13, 2019, Defendant's "Summation on Motion to Suppress Evidence" (ECF No. 44) [hereinafter "Summation"], filed on July 3, 2019; and the Government's "Response to Defendant's Summation" (ECF No. 45) [hereinafter "Response to Summation"], filed on July 3, 2019, in the above-captioned cause. After due consideration, the Court is of the opinion that the Motion should be denied for the reasons that follow.

# I. FINDINGS OF FACT

On June 13, 2019, a suppression hearing was held. The Court heard the testimony of Andrew Fyffe, Special Agent, Homeland Security Investigations; Isaias Saucedo, Officer, U.S. Customs and Border Protection; Briana Blanco, Officer, U.S. Customs and Border Protection; Jesus Barron, Officer, U.S. Customs and Border Protection; Jose Fuentes, Officer, U.S. Customs and Border Protection; and Defendant Ricardo Ramirez, Jr.

On November 7, 2018, Defendant attempted to enter the United States from Mexico via the Bridge of Americas port of entry in El Paso, Texas. Mot. 2; Resp. 2. Defendant, who lived in Ciudad Juarez, Mexico, but worked and went to community college in El Paso, Texas, was going to his work at Walmart, which was to start at 5:30 pm. Tr. 117:11–119:10, June 21, 2019, ECF No. 42; Resp. 10. Defendant arrived at the port of entry at approximately 5:06 pm. Tr. 117:11–119:10.

## A. Referral to Secondary Inspection

Defendant presented his United States passport card to Officer Cesar Garcia, who scanned the card into the computer. Mot. 2; Resp. 2. The Treasury Enforcement Communication System (TECS)[1], a computerized

---

[1] "The TECS is an investigative tool of the Department of Homeland Security that keeps track of individuals entering and exiting the country and of

database, generated a referral that alerted the officer that Defendant might have child pornography and was possibly associated with the purchase of child pornography. *Id.* Specifically, the TECS record indicated, "SUBJ LINKED TO THE PURCHASE OF CHILD PORNOGRAPHY" and "IF ENCOUNTERED, REFER TO SECONDARY, RECOMMEND MEDIA EXAM." Gov't Ex. 6.

Officer Garcia escorted Defendant and his vehicle to secondary inspection. Mot. 2; Resp. 2. Officer Jesus Barron was the TECS coordinator on duty that afternoon and was stationed in a "super booth" where he reviewed the TECS record on a computer. Tr. 88:14–21, 91:12–17. Officer Barron contacted the originator of the TECS record and discussed what the originator "wanted to do with the further inspection." *Id.* at 93:22–94:2. Additionally, Officer Barron ran a "super query," a query for more information and a better description of the TECS record, but did not discover any additional information other than to contact the originating agent. *Id.* at 94:10–23.

---

individuals involved in or suspected to be involved in crimes." *United States v. Cotterman*, 709 F.3d 952, 958 (9th Cir. 2013).

## B.  Initial Search of Defendant's Cell Phone

At secondary inspection, Officer Isaias Saucedo took a negative declaration for goods or merchandise from Defendant and questioned Defendant regarding his travel. Tr. 36:21–25, 38:19–25, 110:13–20. Subsequently, Officer Saucedo asked Defendant to drive his vehicle through the "Z-portal," a type of x-ray machine. Resp. 2; Tr. 38:3–6. Defendant declined to do so, indicating that he suffered from headaches from the machine. *Id.*; Tr. 38:3–18. Accordingly, Officer Saucedo drove the vehicle through the Z-portal machine. *Id.* Meanwhile, Officer Briana Blanco escorted Defendant from one side of the Z-portal machine to the other and waited with Defendant. Tr. 71:5–72:5. After Officer Saucedo drove Defendant's vehicle through the Z-portal machine, he parked the vehicle, placing the keys on the windshield, and went to a booth to ask Officer Barron "what else he wanted [Officer Saucedo] to perform for the inspection." *Id.* at 40:23–42:1. In response, Officer Barron instructed Officer Saucedo to "go through" Defendant's cell phone. *Id.* at 41:24. Accordingly, Officer Saucedo stepped out of the booth and walked to Defendant and Officer Blanco. *Id.* at 42:2–4.

It is undisputed that—after certain interactions between Officer Saucedo, Officer Blanco, and Defendant—Defendant ultimately unlocked his

4

phone and provided it to Officer Saucedo, who then searched the phone and discovered images that he suspected to be child pornography. *See* Tr. 54:14–55:24; Mot. 2; Resp. 2. However, Officer Saucedo, Officer Blanco, and Defendant's testimony differ as to the precise interactions between the officers and Defendant.

Specifically, Officer Saucedo testified that Defendant unlocked his phone without hesitation and only expressed hesitation upon being asked to navigate to his pictures on his phone:

> I asked Mr. Ramirez can I have you unlock your phone. He unlocked his phone. I did not know how to get to his pictures . . . I told him I am going to look through your pictures, can you show me how to look through the picture. He pause[d] and told me -- he looked at Officer Blanco and told me I have personal stuff.

Tr. 42:5–9. According to Officer Saucedo, Defendant did not hesitate when Officer Saucedo asked Defendant if he can unlock his phone. Tr. 42:10–14. Specifically, Defendant did not say anything and "just unlocked it." *Id.* at 42:19–24. Additionally, Officer Saucedo testified that, after Defendant indicated that he had "personal stuff" in his cell phone, Officer Blanco told him that "we are all adults." *Id.* at 42:22–43:9. According to Officer Saucedo, Defendant did not express any additional hesitation after this exchange with Officer Blanco. *Id.* Finally, Officer Saucedo testified that he

did not threaten Defendant in any way at any time during his interaction with Defendant. *Id.* at 39:23–24.

Meanwhile, Officer Blanco testified that Defendant handed his cell phone to Officer Saucedo but expressed hesitation when asked to unlock the cell phone:

> Officer Saucedo came over and asked for a cell phone. A cell phone was handed to him. . . . By Mr. Ramirez. Officer Saucedo looked at it. I was not sure what he was doing with it. He asked Mr. Ramirez to go ahead and unlock your phone. Mr. Ramirez looked at his cell phone and said I have personal things on here. From there, I said we are all adults here. At that point, [Mr. Ramirez] did something with his phone and handed it back to . . . Officer Saucedo.

*Id.* at 73:23–74:9. Officer Blanco testified that she did not notice any hesitation by Defendant other than his comment regarding having personal things on the phone. *Id.* at 75:2–5. In particular, she testified that Defendant "never said no" to Officer Saucedo's request. *Id.* at 80:10–19. Additionally, though Officer Blanco initially testified that Officer Saucedo "asked for a cell phone," she later testified that she could not recall whether Officer Saucedo asked or instructed Defendant to unlock the phone. *Id.* at 73:23–74:9, 81:6–11.

Meanwhile, Defendant testified that Officer Saucedo demanded access to Defendant's cell phone and Defendant objected:

> As the car finished with the x-rays, Officer Saucedo comes at me, and he pretty much demanded to open my cell phone at which point I hesitated. I told him no, what for? I didn't let him answer. I quickly said I have sensitive pictures of me and my girlfriend on my cell phone. That's when Officer [Blanco] said we are all grownup here. . . . Soon after Officer Saucedo demanded again I need to see your phone at which point I hesitated, and he said we can do this the easy way or do this the hard way.

*Id.* at 110:21–111:13. Additionally, Defendant testified, "I perceived [Officer Saucedo's tone] as a threatening tone like we are going to open it whether you like it or not, and I remember I grabbed it and took my fingerprints password off, and I just opened it." *Id.* at 113:3–7. According to Defendant, he had experienced a similar situation two to three years ago, in which officers asked to check his cell phone, he declined, he was put in holding cell for two to three hours, and he ultimately agreed to open his cell phone so that he would not be late for work. *Id.* at 111:14–112:12. Regarding the November 2018 search of his cell phone at issue in this case, Defendant testified that he unlocked the phone because he remembered the incident from two to three years ago and did not want to be late to work. *Id.* at 121:20–122:8.

In addition, Defendant testified that, after he unlocked his phone, the following occurred:

> I set it up to my pictures of my cell phone, and [Officer Saucedo] went through it, and he pressed the home button and started searching and started inspecting it at which point I sort of made a

7

hand gesture like what are you doing. By this time, Officer Blanco
got aggressive. She didn't do anything physically. She made
herself or her presence felt and, afterwards they grabbed me by
the arm tightly in a way sort of not arresting me but holding me
back and pushed me to the holding cell.

*Id.* at 113:9–17.

Having observed Officer Saucedo, Officer Blanco, and Defendant's

demeanor and testimony at the Suppression Hearing, the Court considers

the consistent testimony of Officer Saucedo and Officer Blanco most credible

and makes the following findings. Both Officer Saucedo's testimony[2] and

Officer Blanco's initial testimony[3] support that Officer Saucedo asked

Defendant to, and did not demand that he, unlock his cell phone.

Accordingly, the Court finds that when Officer Saucedo initially approached

Defendant, he asked Defendant to unlock his cell phone and did not demand

that Defendant unlock his cell phone. Additionally, the Court finds, based

on the consistent testimony of both Officer Saucedo and Officer Blanco, that

---

[2] In Part III.A.2.b.ii of this Order, the Court discusses, in greater detail,
Officer Saucedo's testimony on the issue of whether he asked or instructed
Defendant to unlock his cell phone.

[3] Officer Blanco initially testified that Officer Saucedo "came over and asked
for a cell phone" and "asked [Defendant] to go ahead and unlock [his] cell
phone." Tr. 73:23–74:9. However, on cross-examination, Officer Blanco was
unable to recall Officer Saucedo's exact words and testify whether Officer
Saucedo asked or told Defendant to unlock his cell phone. *Id.* at 78:11–79:3.

the only hesitation that Defendant expressed was his indication that he had personal things on his cell phone.

## C.   Defendant's Placement in Holding Cell

Subsequent to Officer Saucedo's initial search of Defendant's cell phone, Defendant was escorted from the secondary area and was placed into a holding cell. *Id.* at 76:4–11. Defendant testified that when he was taken to the cell, the officers had their "batons out but not in a threatening way." *Id.* at 124:9–11. According to Defendant, prior to being put in the holding cell, Defendant was asked for his cell phone's passcode again. *Id.* at 114:3–6. Defendant testified, "Since I already had given it, I figured what is the point of fighting it." *Id.* Officer Blanco testified that she was given Defendant's cell phone so that she could ensure that it would "continue to be unlocked." *Id.* at 76:7–19. Specifically, she scrolled the phone up and down to keep the cell phone open and prevent it from locking due to inactivity. *Id.* In doing so, she saw images of females who were not fully dressed and who she believed to be below the age of 18. *Id.* at 77:3–16.

Defendant asked Officer Barron why he was being held and Officer Barron replied that, often, individuals have similar names to other individuals that are wanted. *Id.* at 97:14–99:6. At the Suppression Hearing, Officer Barron admitted that this was a lie, as he understood that Defendant

9

was being held because of the suspected child pornography discovered on his cell phone. *Id.* at 98:23–99:6. Additionally, at some point, Officer Barron asked Defendant to unlock his cell phone because it had locked. *Id.* at 101:19–102:10. Officer Barron stated, "[G]o ahead and do it if you don't have anything to hide." *Id.* at 99:12–100:19. Officer Barron looked at pictures in Defendant's cell phone and saw what he believed to be child pornography. *Id.* at 102:25–103:7.

Additionally, Officer Jose Fuentes testified that he asked Defendant for his passcode and Defendant complied without any resistance. *Id.* at 106:24–107:7. Officer Fuentes testified that he "didn't unlock the phone to look at it" but to make it "easier for the agents when they arrived to access the phone." *Id.* at 107:24–108:1.

That same day, Agent Andrew Fyffe, a Special Agent with Homeland Security Investigations received a call regarding the possibility of child pornography on Defendant's phone and proceeded to the port of entry to investigate the matter. *Id.* at 5:16, 6:1–17. Once at the port of entry, Agent Fyffe made contact with Defendant, who was inside a holding cell, and spoke with him for fifteen minutes. *Id.* at 6:18–7:17. At some point, Agent Fyffe read Defendant his *Miranda* rights. *Id.* at 7:19–20, 115:25–116:2. Agent Fyffe executed a search warrant on Defendant's cell phone and performed a

10

forensic examination of the cell phone, revealing approximately 1,400 files containing suspected child pornography. *Id.* at 14:2–11. The forensic examination involved plugging a device into the cell phone and applying forensic software. *Id.* at 14:23–15:6.

Subsequently, on December 4, 2018, Defendant was charged in a two-count indictment with transportation of child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and (b)(1), and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). Indictment, Dec. 4, 2018, ECF No. 13.

## II.  LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions. *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)). Accordingly, "[t]he government bears the ultimate burden of proof when it searches without a warrant." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998) (citing *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993)); *see*

*United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001) ("When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional."); *United States v. Riley*, 968 F.2d 422, 424–25 (5th Cir. 1992) ("Because a warrantless search is presumed to be unreasonable, the Government has the burden of proving that the warrantless search was conducted pursuant to an exception.").

## III.  ANALYSIS

In his Motion, Defendant seeks to suppress "[a]ny and all documents, books, records, notes or other tangible things that were seized from the Defendant's telephone" on November 7, 2018.  Mot. 1.  Specifically, Defendant argues that Defendant only provided his cell phone passcode to officers "involuntarily and without effective consent" after being "frighten[ed] and coerced by the demands from CBP Officers." *Id.* at 2.  In addition to Officer Saucedo's initial search of Defendant's cell phone, Defendant argues that there were "subsequent and continuing violations when . . . at least three other CBP Officers repeated these violations."  Summation 3–4. Finally, Defendant argues that "[a]ny statements made after the initial discovery of any prohibited material should be suppressed" because the

officers failed to read Defendant his *Miranda* rights after discovering the suspected child pornography. *Id.* at 5.[4]

Meanwhile, the Government argues that the search of Defendant's phone falls under two exceptions to the warrant requirement: the border search exception and the consent to search exception. Resp. 3. Specifically, the Government argues that the "cursory, manual" search of Defendant's phone at the border was a routine border search requiring no suspicion. *Id.* at 6. Alternatively, the Government argues, even if the search were not routine, the TECS referral provided the requisite reasonable suspicion to manually search the phone. *Id.* Additionally, the Government argues that Defendant voluntarily consented to the search of his phone and, therefore, the search fell under the voluntary consent exception to the warrant requirement. *Id.* at 7. Finally, the Government argues that suppression is

---

[4] Additionally, Defendant broadly moves to suppress other evidence, including "[a]ll books, letters, notes, records, documents and other tangible things that were seized from the person of [Defendant]"; "[a]ny and all documents, books, records, notes or other tangible things that were seized from the Defendant's . . . motor vehicle"; and the testimony of law enforcement regarding such evidence. Mot. 1–2. Based on the facts presented in Defendant's Motion, it is not clear what evidence, other than the images found on Defendant's cell phone, Defendant seeks to suppress. Accordingly, the Court will primarily consider the issue of whether the evidence obtained from Defendant's cell phone should be suppressed. Additionally, the Court will consider Defendant's argument that any statements should be suppressed due to the officers' failure to immediately read him his *Miranda* rights. *See* Summation 5.

inappropriate because the "good faith" exception to the exclusionary rule applies. *Id.* at 10.

After due consideration, the Court is of the opinion that the Government has met its burden of establishing that the search of Defendant's cell phone was constitutional. First, the initial search of Defendant's cell phone, prior to his placement in the holding cell, falls under the consent exception to the warrant requirement because Defendant voluntarily consented to the search. Second, the officers' subsequent searches of Defendant's cell phone following Defendant's placement in the holding cell fall within the border search exception to the warrant requirement. Alternatively, the fruits of the subsequent searches should not be suppressed pursuant to the good faith exception to the exclusionary rule. Additionally, the Court denies Defendant's request to suppress his statements under the theory that the officers failed to initially read him his *Miranda* rights. Specifically, Defendant fails to identify the statements that he seeks to suppress as well as the specific conduct that might constitute an "interrogation" pursuant to *Miranda*.

## A.    Initial Search:  Consent to Search Exception

"One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to

14

consent." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)

(quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

"When courts review a search justified by consent, there are four

distinct issues." *United States v. Freeman*, 482 F.3d 829, 831 (5th Cir. 2007).

"First, as a threshold matter, the government must demonstrate that the

defendant did consent," a determination that is "based on the totality of

circumstances." *Id.* at 831–32 (citing *United States v. Price*, 54 F.3d 342,

345–46 (7th Cir. 1995)). Second, if the government is successful in

demonstrating consent, the Government must next demonstrate that the

defendant consented voluntarily. *Id.* at 832 (citing *Schneckloth*, 412 U.S. at

222). Third and fourth, the government must show that "the search was

within the scope of consent" and that "the consenting individual had

authority to consent."[5] *Id.* (first citing *United States v. Ibarra*, 965 F.2d

1354, 1356 n.2 (5th Cir. 1992); then citing *United States v. Matlock*, 415 U.S.

164, 169–71 (1974); and then citing *Illinois v. Rodriguez*, 497 U.S. 177, 183–

89 (1990)).

The Court will first address the first and third issues for consent—

whether Defendant did consent to the search and whether the search was

---

[5] "Unlike the first two issues, scope and authority are not determined based
on a totality-of-the-circumstances standard, but by a reasonable-officer
standard." *Freeman*, 482 F.3d at 832.

within the scope of consent—before determining whether Defendant voluntarily consented to the search. Regarding the fourth issue, the parties do not dispute that Defendant had authority to consent. The Court will only address whether Defendant consented to Officer Saucedo's initial search of his cell phone at secondary inspection, prior to Defendant's placement in the holding cell, as the border search exception applies to the subsequent searches.

### 1. Whether Defendant Did Consent

First, the Court determines that Defendant did consent to the initial search of his cell phone. The Fifth Circuit has recognized that "consent 'can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent.'" *United States v. Escamilla*, 852 F.3d 474, 484 (5th Cir. 2017) (quoting *United States v. Martinez*, 410 F. App'x 759, 763 (5th Cir. 2011)), *cert. denied*, 138 S. Ct. 336 (2017). Here, in response to Officer Saucedo's request that Defendant unlock his cell phone, Defendant initially hesitated but ultimately unlocked his cell phone and provided it to Officer Saucedo. Accordingly, in response to Officer Saucedo's implicit request for consent to search Defendant's phone, Defendant actively complied by unlocking his cell phone and handing it to Officer Saucedo. Therefore, Defendant consented to the initial search of his cell phone. *See*

*Escamilla*, 852 F.3d at 484 (holding that the defendant consented to the search of his phone when the defendant "actively complied" with the agent's request to "look through" his phone "by handing the phone directly to him").

## 2. Whether the Search was within the Scope of Consent

"'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness'—what a reasonable person would have understood by the exchange between the officer and the suspect." *United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 2019) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)), *cert. denied*, 139 S. Ct. 1584 (2019). "[A]n affirmative response to a general request is evidence of general consent to search." *Id.* (quoting *United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010)). "[A] failure to object to the breadth of the search is properly considered 'an indication that the search was within the scope of the initial consent.'" *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994)). "Where there is ambiguity regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope." *Sarli*, 913 F.3d at 495 (citing *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003)).

Here, Officer Saucedo's initial search of Defendant's cell phone was within the scope of Defendant's consent. The testimony of Officer Saucedo,

17

Officer Blanco, and Defendant support that Officer Saucedo initially requested Defendant to merely unlock his phone and did not convey limitations to the scope of the request. Though Officer Saucedo testified that he asked Defendant to navigate to his pictures folder, he testified that this request was after Defendant complied with Officer Saucedo's general request that Defendant unlock his phone.

Moreover, Defendant's hand gesture during Officer Saucedo's search did not affirmatively limit the scope of Defendant's consent. Specifically, Defendant testified that when Defendant first opened his cell phone, he navigated to a certain pictures folder. However, according to Defendant, Officer Saucedo subsequently "pressed the home button and started searching and started inspecting it at which point [Defendant] sort of made a hand gesture like what are you doing." Tr. 113:9–17. Though Defendant might have intended to limit the scope of the search in making his hand gesture, both Officer Saucedo and Officer Blanco testified that Defendant exhibited no hesitation regarding providing his cell phone other than his comment that the cell phone had "personal things." Accordingly, Defendant failed to make a specific, verbal objection to the breadth of the search and his hand gesture failed to otherwise communicate an objection to the officers. Thus, Defendant did not affirmatively limit the scope of his consent to the

18

search and Officer Saucedo's search was within the scope of Defendant's general consent to the search.

### 3. Whether Defendant's Consent was Voluntary

"[T]he question [of] whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. Courts in the Fifth Circuit use a six-factor test to assess voluntariness, examining:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Freeman*, 482 F.3d at 832–33 (citing *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993)). "All six factors are relevant, but no single one is dispositive or controlling." *Id.* "The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Kelley*, 981 F.2d at 1470 (citing *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991)).

### a. Voluntariness of Custodial Status

"Cases holding consent to be voluntary often focus on the suspect's ability to end her encounter with law enforcement officers." *United States v.*

*Martinez*, 537 F. App'x 340, 344 (5th Cir. 2013) (first citing *United States v. Sanchez–Pena*, 336 F.3d 431, 443 (5th Cir. 2003); and then citing *United States v. Boukater*, 409 F.2d 537, 539 (5th Cir. 1969)). In *United States v. McAuley*, the court addressed the voluntariness of a defendant's consent to search his computer after he had been referred to secondary inspection at the port of entry and had been sitting in an office at the port of entry for fifty minutes prior to providing consent. 563 F. Supp. 2d 672, 680 (W.D. Tex. 2008), *aff'd*, 420 F. App'x 400 (5th Cir. 2011). The court held that the defendant voluntarily consented to a search of his computer when, among other factors, the defendant "was not under any type of custodial detention or formal arrest at the time consent was requested" and the defendant "was free to leave, however, [an agent testified] that most people will not leave until the agents at a port of entry complete their searches." *Id.*

Here, at time of the initial search, Defendant had been referred to secondary inspection after having attempted to enter the United States. Defendant testified that he had been sent to secondary inspection at least twelve to fifteen times over the prior year. Tr. 120:4–10. It appears that Defendant was not in secondary inspection long before Officer Saucedo asked Defendant to unlock his cell phone. Specifically, Defendant was in secondary inspection while Officer Saucedo performed the inspection, which does not

appear to have been prolonged: upon Defendant's arrival in secondary inspection, Officer Saucedo took a negative declaration for goods or merchandise from Defendant, questioned Defendant about his travel, drove Defendant's vehicle through the Z-portal, consulted with Officer Barron, and then returned to Defendant and Officer Blanco to ask Defendant to unlock his phone. Additionally, at the time that Defendant consented to the initial search, he was not under formal arrest and had not yet been placed in the holding cell. *See United States v. Hernandez*, 229 F. App'x 331, 332 (5th Cir. 2007) (holding that "[r]eferral to secondary inspection at a border checkpoint [within the United States] does not constitute an arrest requiring Miranda warnings"). However, Defendant's prior experience at the border suggests that he might have believed he was not free to leave. Specifically, on one prior occasion, an officer asked to look at Defendant's phone and Defendant's initial refusal led to Defendant's detention for two to three hours.

Accordingly, although Defendant was not under arrest at the time of the initial search, it is not clear that Defendant was free to leave. *See McAuley*, 563 F. Supp. 2d at 680 (determining that the defendant was free to leave following referral to secondary inspection at port of entry but considering the testimony that most people will not leave until agents have completed their search). Indeed, the Government does not aver that

Defendant was informed that he was free to leave. Given these facts, the Court determines that Defendant was not free to leave and is of the opinion that this factor weighs in favor of involuntariness, though only slightly because Defendant was not under formal arrest, voluntarily entered the port of entry, and does not appear to have been in secondary inspection for a prolonged period of time prior to his consent to the initial search.

### b.    Presence of Coercion

The second factor is "the presence of coercive police procedures." *Freeman*, 482 F.3d at 832. For the reasons that follow, the Court determines that no coercive police procedures were present at the time of Defendant's consent to the initial search. Specifically, the officers did not threaten to physically harm Defendant, did not command Defendant to consent to the search, and did not deceive or trick Defendant into providing consent.

### i.    Threats by Officers

"[T]he mere presence of armed officers does not render a situation coercive." *United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011). In determining whether coercive procedures were used, courts have considered whether the law enforcement officials present at the scene drew their weapons, raised their voices, or threatened the defendant. *See United States v. Mata*, 517 F.3d 279, 283 (5th Cir. 2008) (noting lack of coercion

where officers did not have their weapons drawn and did not yell at or threaten the defendant); *see also Martinez*, 410 F. App'x at 764 ("The officers were not pointing their firearms at anyone and were not threatening [the defendant] or shouting.").

Here, the record supports that neither Officer Saucedo nor Officer Blanco threatened Defendant with their weapons prior to the initial search. During the Suppression Hearing, the Government asked Defendant whether he was "rough[ed] up" or "hit" when he was taken to the holding cell. *Id.* at 123:24–124:13. Defendant testified that the officers did not hit him. *Id.* Subsequently, the Government asked Defendant, "Did anybody pull[ ]out their weapon and threaten you with it?" *Id.* at 124:7–8. Defendant responded that officers had their "batons out but not in a threatening way." *Id.* at 124:9–13. Defendant did not recall which officers had their batons out and did not specifically testify that any officer had a baton out at the time of his initial consent to the search. *Id.* Rather, it appears from the line of questioning that Defendant's testimony about the batons was regarding the time when he was taken to the holding cell. Moreover, Officer Saucedo testified that he did not at any time during his interaction with Defendant draw his weapon or baton, point at his weapon or baton, or threaten Defendant in any way. *Id.* at 39:15–24. Accordingly, based on the record,

the Court determines that, prior to the initial search of Defendant's cell phone, the officers did not brandish their weapons and certainly did not threaten Defendant with a weapon.

Furthermore, it does not appear that Officer Saucedo or Officer Blanco threatened to physically harm Defendant. Defendant testified that, after Officer Saucedo had started searching his cell phone and Defendant had made a hand gesture, Officer Blanco acted as follows: "Officer Blanco got aggressive. She didn't do anything physically. She made herself or her presence felt. . . ." *Id.* at 113:9–17. Defendant did not state what specific actions Officer Blanco did that he interpreted as aggressive or as making her presence felt. Thus, lacking any specific detail regarding Officer Blanco's conduct, the Court cannot conclude that Officer Blanco's conduct rose to the level of a coercive procedure.

Additionally, Defendant testified that after Officer Saucedo demanded that he open his cell phone a second time, and Defendant hesitated, Officer Saucedo stated, "we can do this the easy way or do this the hard way." *Id.* at 110:21–111:13. Defendant testified that he "perceived [Officer Saucedo's tone] as a threatening tone like we are going to open it whether you like it or not." *Id.* at 113:3–7. Neither Officer Saucedo nor Officer Blanco testified that Officer Saucedo made such a statement; rather, both officers testified

24

that Defendant expressed no additional hesitation following his statement that there were personal things on his cell phone. Accordingly, it is not clear whether Officer Saucedo made the alleged statement.

However, assuming Officer Saucedo did make the statement, the statement, in light of the surrounding facts, does not rise to the level of a coercive procedure. Specifically, the record contains no evidence that, at the time of the alleged statement, the officers brandished their weapons, pointed to their weapons, or otherwise threatened to physically harm Defendant. Accordingly, in light of the record, "the hard way" does not suggest physical harm to Defendant. Thus, the alleged statement did not constitute a threat to physically harm Defendant.

Instead, Defendant testified that he interpreted the statement based on his prior experience involving a search of his cell phone at the border from two to three years ago. *Id.* at 111:10–25. Specifically, during his prior experience, officers "wanted to check" his cell phone and he objected, "[N]o, you need a warrant." *Id.* Consequently, Defendant was put in a holding cell for two to three hours. *Id.* Because Defendant was going to be late for work, he told an officer that he needed to go to work and asked to make a phone call. *Id.* The officer responded, "I will let you go right away if you open your cell phone," and Defendant agreed. *Id.*

Defendant testified that, in this case, he ultimately unlocked his cell phone so that he would not "pass through the same embarrassing experience as the first time" and because he did not "want to get sent back for two hours and waste [his] time and get fired from work." *Id.* at 121:7–122:5. Accordingly, based on Defendant's testimony, including his interpretation of Officer Saucedo's statement, "the easy way" likely referred to Defendant providing consent to the search and "the hard way" likely referred to obtaining a warrant to search Defendant's cell phone.

So long as the agent's statement is not pretextual, "[i]t is well-settled that [an agent's] statements to the effect that he would obtain a warrant if [the defendant] did not consent to the search does not taint [the defendant's] consent to a search." *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). Here, the alleged statement does not appear to be pretextual as there is no evidence that Officer Saucedo did not intend to obtain the additional authorization to cell search Defendant's phone if Defendant refused to consent. Accordingly, in light of the surrounding facts, Officer Saucedo's statement that "we can do this the easy way or do this the hard way" was not a threat to physically harm Defendant and was not pretextual. Therefore, the Court determines that Officer Saucedo's alleged statement in this context was not a coercive procedure.

### ii. Commands by Officers

In addition, coercive procedures may be found if an officer's conduct constituted a command or direction rather than a request for consent. *United States v. Zavala*, 459 F. App'x 429, 433 (5th Cir. 2012) (holding there were coercive procedures when defendant followed officer to a checkpoint where defendant's vehicle was subject to a canine sniff after officer stated, "I'm going to go ahead and take you to the checkpoint, sir," which the court determined could "more accurately be described as directions to follow rather than request for consent to follow"); *United States v. Drayton*, 536 U.S. 194, 206 (2002) (finding consent to search was voluntary when "[n]othing [the officer] said indicated a command to consent to the search").

As detailed above in the Court's Findings of Fact, the Court, having observed the demeanor and testimony of the witnesses during the Suppression Hearing, finds that Officer Saucedo asked, and did not demand, Defendant to unlock his cell phone. On multiple occasions, Officer Saucedo testified that he asked Defendant to unlock his phone. Tr. 42:3–9, 52:1–4. However, as Defendant correctly identifies in his Summation, Officer Saucedo testified at one point on cross-examination, "I instructed Mr. Ramirez to unlock his phone." *Id.* at 51:11–12. Officer Saucedo was later expressly asked whether the conversation he had with Defendant was asking

Defendant to unlock his cell phone or instructing Defendant to unlock his cell phone. *Id.* at 52:6–13. In response, Officer Saucedo clarified, "It was asking. It was never instructing." *Id.* Given Officer Saucedo's testimony that he asked Defendant to unlock his cell phone and his clarification that he never instructed Defendant to unlock his cell phone, the Court determines that Officer Saucedo asked Defendant to unlock his cell phone. Accordingly, the Court determines that, during the initial search of Defendant's cell phone, no officers commanded Defendant to provide and unlock his cell phone.

### iii. Deceit by Officers

In his Summation, Defendant points to two instances of deceit or "police trickery" and argues that they induced Defendant to unlock his cell phone. Summation 4.

First, Defendant states that "[d]uring the suppression hearing, CBP Officer Barron admitted lying to Ramirez when asked why he was being held in the lockup." *Id.* (citing Tr. 99:2–6). However, Officer Barron's admitted lie to Defendant was not a coercive technique relevant to Defendant's consent to the initial search because the lie occurred after Officer Saucedo had already performed the initial search. The lie might be relevant to whether Defendant was coerced to consent to the subsequent searches of

Defendant's phone upon his placement in the holding cell. However, the Court need not determine whether Defendant consented to those subsequent searches because they were lawful pursuant to the border search exception, as explained in Part III.B. Accordingly, Officer Barron's lie does not factor into the consent analysis regarding Defendant's consent to the initial search.

Second, Defendant states that "CBP Officer Blanco also testified that she used police trickery to induce Ramirez to provide his private pin to Officers," citing to the portion of the transcript in which Officer Blanco testified that she stated "we are all adults" because Defendant "was hesitant to open his cell phone." *Id.* (citing Tr. 79–80). The Court is not persuaded that Officer Blanco's statement that "we are all adults here" amounts to a coercive technique. Tr. 74:1–7. The statement was in response to Defendant's comment that he had "personal things" on the cell phone. *Id.* Officer Saucedo interpreted Officer Blanco's statement to essentially mean "don't be embarrassed." *Id.* at 53:12–15. It is unclear how this statement would constitute "police trickery," as it was a true statement that Officer Blanco offered in response to Defendant's hesitation regarding revealing the "personal things" on his cell phone. Additionally, the record does not support that Officer Blanco's statement was made in a threatening manner or with her voice raised. Therefore, the Court determines that Officer Blanco's

statement, though perhaps encouraging Defendant to unlock his phone, did not amount to a coercive or deceitful technique.

In sum, regarding the initial search of Defendant's phone, the Court determines that the officers did not threaten Defendant in a coercive manner, command Defendant to unlock his phone, or deceive Defendant into unlocking his phone. Therefore, no coercive techniques were present and this factor weighs in favor of voluntariness.

### c. Extent of Defendant's Cooperation with the Police

The third factor used to determine the voluntariness of consent is "the extent and level of the defendant's cooperation with the police." *Freeman*, 482 F.3d at 832. Relevant to this inquiry is whether the defendant's consent to the search is "consistent with the rest of [the defendant's] behavior that night." *Martinez*, 410 F. App'x at 764.

Here, Defendant was generally cooperative with the officers. Officer Blanco testified that Defendant was not disrespectful to Officer Blanco or Officer Saucedo in any of his interactions. Tr. 75:12–14. Similarly, Officer Saucedo testified that, when he was taking a negative declaration for goods or merchandise from Defendant, Defendant was not combative, did not "give [him] any attitude," and did not talk back. *Id.* at 38:23–39:4. Additionally, though Defendant declined to drive his vehicle through the Z-portal, he

permitted Officer Saucedo to do so. *See id.* at 40:5–11. Therefore, the Court finds that this factor weighs in favor of a finding of voluntariness.

### d. Defendant's Awareness of Right to Refuse to Consent

The fourth factor is "the defendant's awareness of his right to refuse to consent." *Freeman*, 482 F.3d at 832. Here, the Government concedes that Defendant was not explicitly informed of his right to refuse consent. Resp. 9. However, Defendant testified that he had a previous experience at the border in which he objected to the search of his cell phone and stated, "[N]o, you need a warrant." Tr. 111:15–25. This prior experience tends to show that Defendant was aware that he could refuse to consent to the search but that such refusal might lead to two to three hours of detention while a warrant is sought. Accordingly, the Court is of the opinion that this factor weighs in favor of a finding that Defendant's consent was voluntary.

### e. Defendant's Education and Intelligence

The fifth factor is "the defendant's education and intelligence." *Freeman*, 482 F.3d at 832. Here, Defendant does not contest that he has a high school diploma and was in the process of completing his aerospace engineering studies at community college. *See generally* Mot.; Resp. 10; Tr. 110:7, 120:21. Additionally, Defendant appeared intelligent when he testified at the Suppression Hearing, commenting that he declined to drive

31

through the Z-portal machine because he believed that the Z-portal involved gamma rays, not x-rays, and had learned "if you're exposed to gamma ray radiation more than twice per year that your chances of getting cancer grow exponentially." Tr. 120:14–20. Therefore, the Court is of the opinion that this factor weighs in favor of finding that the consent was voluntary. *See United States v. Benavides*, No. SA-09-CR-903, 2010 WL 5373884, at *4 (W.D. Tex. Dec. 21, 2010) (holding that consent to search was voluntary when, among other factors, the defendant had a high school diploma).

### f. Defendant's Belief that No Incriminating Evidence Will be Found

Finally, the sixth factor is "the defendant's belief that no incriminating evidence will be found." *Freeman*, 482 F.3d at 832. Consent is more likely to be voluntary when the defendant did *not* know incriminating evidence would be found. *See United States v. Ponce*, 8 F.3d 989, 998 (5th Cir. 1993) (holding consent to search was voluntary when the defendant stated, "Dang, I forgot it was there," upon the officer's discovery of heroin in the defendant's watch pocket); *United States v. Sanchez-Mendoza*, No. MO-09-CR-003, 2009 WL 10680137, at *5 (W.D. Tex. Apr. 29, 2009) (holding that the defendant's statement that she was unaware cocaine had been placed in her vehicle "suggests that consent was voluntary because she would not have known that incriminating evidence would be discovered").

Here, Defendant does not argue that he knew that his cell phone contained incriminating evidence. Although Defendant expressed hesitation because his cell phone had "personal things," Defendant testified that he was concerned about pictures of himself and his girlfriend, not because he knew there was child pornography on the cell phone. Tr. 122:14–19. Therefore, at the time that Defendant provided consent, Defendant was concerned about the personal pictures of himself and his girlfriend and not, apparently, the incriminating evidence on his cell phone. Thus, the Court determines that this factor weighs in favor of finding that Defendant voluntarily consented to the search.

In sum, considering the totality of the circumstances in light of the factors above, the Court determines that the Government has met its burden of showing that Defendant voluntarily consented to the initial search of his cell phone.

**B.    Subsequent Searches:  Border Search Exception**

The Court now considers the subsequent searches of Defendant's cell phone—the searches by Officer Blanco, Officer Fuentes, and Officer Barron that occurred after Defendant was placed in the holding cell.  After due consideration, the Court concludes that the subsequent searches were lawful

pursuant to the border search exception to the warrant requirement, for the reasons that follow.

One exception to the warrant requirement is the border search and "it has a 'history as old as the fourth amendment itself.'" *United States v. Pickett*, 598 F.3d 231, 234 (5th Cir. 2010) (quoting *United States v. Ramsey*, 431 U.S. 606, 619 (1977)). "Time and again, [the Supreme Court has stated] that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) (quoting *Ramsey*, 431 U.S. at 616).

Thus, "[t]he border search exception permits a government officer at an international border to conduct a 'routine' search and seizure, 'without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.'" *Pickett*, 598 F.3d at 234 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). Furthermore, not only do "routine" border searches require no probable cause or warrant, but they "may be conducted without any suspicion." *United States v. Molina-Isidoro*, 884 F.3d 287, 291 (5th Cir. 2018). Meanwhile, "[s]o-called 'nonroutine' searches need only reasonable

34

suspicion, not the higher threshold of probable cause." *Id.* "'Routine searches' are generally classified as those which do not 'seriously invade a traveler's privacy.'" *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998) (quoting *United States v. Cardenas*, 9 F.3d 1139, 1148 n.3 (5th Cir. 1993)). Accordingly, the Fifth Circuit has held that "officials at the border may cut open the lining of suitcases without any suspicion, *United States v. Chaplinski*, 579 F.2d 373, 374 (5th Cir. 1978), and that with reasonable suspicion they may strip search suspected drug smugglers and drill into the body of a trailer, *United States v. Afanador*, 567 F.2d 1325, 1329 (5th Cir. 1978) (strip search); *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998) (drilling into trailer)." *Molina-Isidoro*, 884 F.3d at 291. The Government has the burden of proving that it had reasonable suspicion to perform a nonroutine search at the border. *See Rivas*, 157 F.3d at 368 (concluding that the government had not "satisfied its burden of proving it had a reasonable suspicion" and excluding "all evidence obtained from the border search").

### 1.    Case Law on Border Searches of Electronic Devices

As described above, "routine border searches may be conducted without any suspicion" whereas "'nonroutine' searches need only reasonable suspicion, not the higher threshold of probable cause." *Molina-Isidoro*, 884 F.3d at 291.

However, the Fifth Circuit has not decided the appropriate level of suspicion required for a border search of an electronic device, declining to decide the issue following the Supreme Court's decision in *Riley v. California*, which recognized increased privacy interests for electronic devices. *Id.* at 289, 292 ("[The Fifth Circuit] had not addressed border searches of an electronic device at the time of [the] search."). In *Riley v. California*, the Supreme Court held that the search incident to arrest exception to the warrant requirement does not apply to searches of data on cell phones. 573 U.S. 373, 386 (2014). Instead, "officers must generally secure a warrant before conducting such a search." *Id.* In so holding, the Supreme Court, however, made clear that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401–02.

In *United States v. Molina-Isidoro*, the Fifth Circuit was invited "to announce general rules concerning the application of the government's historically broad border-search authority to modern technology for which the Supreme Court has recognized increased privacy interests [in *Riley v. California*]." *Molina-Isidoro*, 884 F.3d at 289. The Fifth Circuit declined the invitation. *Id.* Instead, the Fifth Circuit held that suppression of the fruits

36

of the search was not appropriate because the good faith exception to the exclusionary rule applied. *Id.* at 289–90, 293. Specifically, it was "eminently reasonable" for the agents to believe that the search was lawful when their nonforensic search at the border was supported by probable cause. *Id.*

Several courts have confronted the issue of the level of suspicion required for a search of an electronic device at the border. In a case decided prior to *Riley*, the Ninth Circuit held that a cursory, manual search of an electronic device at the border is permissible, even without reasonable suspicion, but that a forensic search of an electronic device must be supported by at least reasonable suspicion. *United States v. Cotterman*, 709 F.3d 952, 957, 961 (9th Cir. 2013) (en banc). Specifically, the Ninth Circuit determined that the officer's initial, manual search, in which the officer merely turned on devices and opened and viewed images, would likely be "reasonable even without particularized suspicion." *Id.* at 961. However, the forensic examination of the defendant's laptop, involving "application of computer software to analyze a hard drive," required reasonable suspicion due to "the comprehensive and intrusive nature of a forensic examination." *Id.* at 957, 962, 967.

Similarly, in *United States v. Kolsuz*, a post-*Riley* decision, the Fourth Circuit held that a forensic search of a digital phone at the border required

37

individualized suspicion. 890 F.3d 133, 137 (4th Cir. 2018), *as amended* (May 18, 2018). The Fourth Circuit reasoned that, in determining whether a "search rises to the level of nonroutine, courts have focused primarily on how deeply it intrudes into a person's privacy." *Id.* at 144. Accordingly, given the scale of data and "uniquely sensitive nature" of the information housed in digital devices, especially in light of the Supreme Court's recognition of such privacy interests in *Riley*, the court held that "a forensic search of a digital phone must be treated as a nonroutine border search, requiring some form of individualized suspicion." *Id.* at 146. However, the court did not decide whether reasonable suspicion or a warrant based on probable cause was required for such a search, holding instead that suppression was inappropriate because the agents reasonably relied on precedent holding that no warrant was required. *Id.* at 137.

In contrast, in *United States v. Touset*, the Eleventh Circuit, unpersuaded by the decisions of the Ninth and Fourth Circuits, held that *Riley* did not disturb the border search exception and, pursuant to the Eleventh Circuit's precedent, "no suspicion is necessary to search electronic devices at the border." *United States v. Touset*, 890 F.3d 1227, 1229 (11th Cir. 2018). The court emphasized that "[t]he Supreme Court has never required reasonable suspicion for a search of *property* at the border, however

non-routine and intrusive." *Id.* at 1233 (emphasis added). Rather, the court reasoned, the Supreme Court and Eleventh Circuit had only required reasonable suspicion for "highly intrusive searches of a *person's body.*" *Id.* at 1233–34 (emphasis added) (quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010)). The court further reasoned that the intrusiveness of a search is defined by the indignity suffered by the person searched and such indignity is not triggered by the personal nature of data stored on electronic devices. *Id.* at 1234. In short, "[p]roperty and persons are different." *Id.*

In sum, though some courts have declined to decide the precise level of suspicion required for the search of an electronic device at the border,[6] the courts that have addressed the issue have not yet required more than reasonable suspicion for forensic searches of electronic devices.[7] Meanwhile,

---

[6] *See, e.g., United States v. Wanjiku*, 919 F.3d 472, 479 (7th Cir. 2019) (affirming denial of motion to suppress because agents acted in good faith when they searched devices with reasonable suspicion and "avoid[ing] entirely the thorny issue of the appropriate level of suspicion required").

[7] *See United States v. Touset*, 890 F.3d 1227, 1229 (11th Cir. 2018) (requiring no suspicion for forensic search); *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018) (requiring individualized suspicion for forensic search but not resolving whether reasonable suspicion or probable cause is required); *Cotterman*, 709 F.3d at 957 (9th Cir. 2013) (requiring reasonable suspicion for forensic search); *see also United States v. Kim*, 103 F. Supp. 3d 32, 59 (D.D.C. 2015) (holding, under totality of "unique" circumstances of case, that the imaging and search of laptop, "aided by specialized forensic software," of

the Court is not aware of a case requiring any suspicion for the manual search of an electronic device at the border.[8]

Additionally, though the Fifth Circuit has not decided the level of suspicion required for searches of electronic devices at the border, the Fifth Circuit has consistently held that particularized reasonable suspicion is the highest standard required for border searches.[9] Thus, analyzing Defendant's case under the current border search exception jurisprudence, if the search of his cell phone was a routine border search, it would be reasonable without a warrant, probable cause, or even reasonable suspicion. *See Montoya de Hernandez*, 473 U.S. at 538. A routine border search "require[s] no justification other than the person's decision to cross our national boundary."

---

unlimited duration and scope was unreasonable when it was supported by little suspicion, was conducted for purpose of gathering evidence in pre-existing investigation, and was disconnected from the government's interests in searching the border).

[8] In his Summation, Defendant argues that a manual search in which a phone is locked with a pin is a "hybrid" search which requires "actual, uninfluenced, and uncoerced consent or the proper application and requirement of a search warrant." Summation 2–3. The Court is not aware of, and Defendant does not cite, case law supporting this proposition.

[9] *See, e.g., United States v. Molina-Isidoro*, 884 F.3d 287, 291 (5th Cir. 2018) (stating that "nonroutine" searches need only reasonable suspicion); *United States v. Smith*, 273 F.3d 629, 633 (5th Cir. 2001) (same); *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998) (same); *United States v. Sandler*, 644 F.2d 1163, 1166 (5th Cir. 1981) (same).

*United States v. Kelly*, 302 F.3d 291, 294 (5th Cir. 2002). If, however, the search of his cell phone was a nonroutine border search, the officers were required to have a particularized reasonable suspicion before conducting the search. *Id.*

The Court concludes that it is unnecessary to decide whether the search of an individual's cell phone is a routine or nonroutine border search because, even if such a search is nonroutine, the search in this case was supported by reasonable suspicion.

## 2.    Reasonable Suspicion

The Court need not decide the constitutional question of whether the search of Defendant's phone was routine or nonroutine, because, following the initial consent search of Defendant's cell phone, the officers had reasonable suspicion to conduct the subsequent searches. *See United States v. Roberts*, 274 F.3d 1007, 1012 (5th Cir. 2001) ("[C]onstitutional issues should be decided on the most narrow, limited basis.").

"Reasonable suspicion entails 'some minimal level of objective justification' that consists of 'more than inchoate or unparticularized suspicion or "hunch,"' but less than the level of suspicion required for probable cause." *United States v. Smith*, 273 F.3d 629, 633–34 (5th Cir. 2001) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Reasonable

suspicion must be based upon 'specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion.'" *Id.* at 634 (quoting *United States v. Cardenas*, 9 F.3d 1139, 1153 (5th Cir. 1993)). "In determining whether government agents possessed a reasonable suspicion that criminal activity was occurring, [the Court] must consider the totality of the particular circumstances." *United States v. Roberts*, 274 F.3d 1007, 1014 (5th Cir. 2001) (quoting *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998)). "[E]ach reasonable suspicion case ultimately turns on its own facts." *Id.* at 1014–15 (citing *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir. 1977)).

Here, the officers had reasonable suspicion to search Defendant's cell phone following the initial consent search. At that point, the TECS record had informed the officers that Defendant was linked to the purchase of child pornography. *See* Gov't Ex. 6 (TECS Record) (stating, "Subj linked to the purchase of child pornography" and, "If encountered, refer to secondary, recommend media exam") (text capitalized in original). Additionally, during the initial consent search of Defendant's phone, Officer Saucedo discovered images that he suspected to be child pornography. Tr. 54:14–55:24. Accordingly, the facts available to the officers following Defendant's initial consent search provided particularized suspicion, not merely a hunch, that

Defendant possessed child pornography on his cell phone. Indeed, the facts likely provided the officers with probable cause to search Defendant's cell phone. *See Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) ("Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925))). Therefore, even if the searches of Defendant's cell phone were nonroutine, the Court determines that the searches of Defendant's cell phone subsequent to the initial consent search were justified by at least reasonable suspicion and were therefore lawful pursuant to the border search exception.

### 3.     Good Faith Exception to the Exclusionary Rule

Finally, even if the subsequent searches of Defendant's cell phone did not fall under the border search exception and thus were unconstitutional, the Court determines that suppression is inappropriate pursuant to the good faith exception to the exclusionary rule.

"The exclusionary rule is a judicially-designed remedy whose primary purpose is to discourage unconstitutional (or possibly otherwise illegal) police misconduct." *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.

1990). The exclusionary rule "functions to suppress evidence obtained directly or indirectly through illegal police activity." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). "When [law enforcement officers] forego legal means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule." *United States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir. 1985).

However, pursuant to the good faith exception to the exclusionary rule, "[t]he fruits of a search need not be suppressed if the agents acted with the objectively reasonable belief that their actions did not violate the Fourth Amendment." *Molina-Isidoro*, 884 F.3d at 290 (citing *United States v. Curtis*, 635 F.3d 704, 713 (5th Cir. 2011)). Accordingly, "[e]ven when the search is held unconstitutional, suppressing evidence is not appropriate if the officers acted reasonably in light of the law existing at the time of the search." *Id.* (citing *Curtis*, 635 F.3d at 713–14). Suppression is inappropriate in such circumstances because "the cost of suppression— excluding the evidence from the truth-finding process—outweighs the deterrent effect suppression may have on police misconduct." *Id.* (citing *Davis v. United States*, 564 U.S. 229, 237–38 (2011)).

In *Molina-Isidoro*, the Fifth Circuit held that suppression of evidence

from the defendant's cell phone was inappropriate because the agents searching the defendant's cell phone "reasonably relied on the longstanding and expansive authority of the government to search persons and their effects at the border." 884 F.3d at 290. Specifically, because *Riley* left open the possibility that "other case-specific exceptions may still justify a warrantless search of a particular phone," it was reasonable for the agents to rely on the pre-*Riley* case law that allowed warrantless border searches of electronic devices. *Id.* at 292 (quoting *Riley*, 134 S. Ct. at 2494).

Additionally, the Fifth Circuit reasoned, no post-*Riley* case had required a warrant for the search of an electronic device at the border, and the leading Fourth Amendment treatise indicated that border searches of electronic devices can be made without a warrant and without probable cause. *Id.* Finally, the court emphasized that "only two of the many federal cases addressing border searches of electronic devices have ever required any level of suspicion." *Id.* at 293 (first citing *Cotterman*, 709 F.3d at 962; and then citing *United States v. Saboonchi*, 990 F. Supp. 2d 536, 569–70 (D. Md. 2014)). Those cases addressed more intrusive forensic searches and only required reasonable suspicion. *Id.* Accordingly, given the state of the law when the agents performed a manual, cursory search of the defendant's phone, "it was eminently reasonable for them to think that the probable

cause they had to believe it contained evidence of drug crimes made the search a lawful one." *Id.*

Similarly, in *United States v. Wanjiku*, the Seventh Circuit held that the agents acted in good faith when they searched the defendant's cell phone, hard drive, and laptop because "they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border." 919 F.3d 472, 479 (7th Cir. 2019). Specifically, at the time that the agents conducted the searches, "they reasonably relied on Supreme Court precedent that required no suspicion for non-destructive border searches of property, and nothing more than reasonable suspicion for highly intrusive border searches of persons." *Id.* at 489.

Here, the Court determines that the officers reasonably relied on legal precedent when, during the subsequent searches of Defendant's phone, they searched Defendant's cell phone with reasonable suspicion that it contained child pornography. As the Fifth Circuit indicated in *Molina-Isidoro* and as the Court described in this Order, the highest level of suspicion that courts have recognized for the intrusive, forensic searches of electronic devices at the border is reasonable suspicion. Therefore, the Court determines that it was objectively reasonable for the officers to believe they did not violate the

Fourth Amendment when they manually searched Defendant's cell phone following Defendant's initial consent search. Thus, even if the subsequent searches of Defendant's phone did not fall under the border search exception, suppression of the fruits of those searches is inappropriate pursuant to the good faith exception to the exclusionary rule.

## C. Failure to Mirandize Defendant Upon Discovery of Suspected Child Pornography

Lastly, Defendant argues that Defendant should have been informed of his *Miranda* rights upon the first discovery of the suspected child pornography. Summation 5. Accordingly, Defendant argues, "Any statements made after the initial discovery of any prohibited material should be suppressed." *Id.*

The seminal case of *Miranda v. Arizona* "established that the prosecution may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Bennett*, 626 F.2d 1309, 1311 (5th Cir. 1980) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). The procedural safeguards include "the now famous *Miranda* rights." *Id.* at 1311. The Supreme Court expounded on the meaning of "custodial interrogation" for Fifth Amendment purposes in *Rhode Island v. Innis*, 446 U.S. 291 (1980). In *Innis*, the Supreme Court clarified

that interrogation can include more than express questioning: "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01. Therefore, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The focus is "primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

"[T]he burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). However, "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination." *Id.*

Here, the Court determines that Defendant has not demonstrated that his Fifth Amendment rights were violated. The record shows that Agent Fyffe read Defendant his *Miranda* rights at some point after Agent Fyffe's arrival at the port of entry and that no other officer read Defendant his *Miranda* rights. Tr. 7:16–20, 115:25–116:2. However, Defendant does not

48

identify any specific conduct by the officers that constitutes an interrogation triggering the requirement to inform Defendant of his *Miranda* rights. Specifically, Defendant broadly argues that "CBP Officers continued to question and coerce Ramirez by ordering him to keep opening his phone, even to the point of his frustration when he responds telling them to write his password down." Summation 5.

However, the officers' requests for Defendant to open his phone were not an "interrogation" pursuant to *Miranda*. Courts have held that "a request for consent to search is not interrogation." *United States v. Maldonado*, 213 F. Supp. 2d 710, 717 (S.D. Tex. 2002) (quoting *United States v. LaGrone*, 43 F.3d 332, 339 (7th Cir. 1994)); *see also United States v. Gonzalez-Garcia*, 708 F.3d 682, 686–87 (5th Cir. 2013) ("[The Fifth Circuit has] suggested that a request for consent is not an 'interrogation' . . . ."). Additionally, even if the request to open Defendant's cell phone is an interrogation pursuant to *Miranda*, Defendant has not identified any statement in response to the interrogation that should be excluded. *See United States v. Stevens*, 487 F.3d 232, 242 (5th Cir. 2007) ("A statement granting 'consent to a search . . . is neither testimonial nor communicative in the Fifth Amendment sense.'") (quoting WAYNE R. LAFAVE, JEROLD H. ISRAEL, & NANCY J. KING, CRIMINAL PROCEDURE § 3.10 (4th ed. 2004)).

49

Additionally, although Defendant broadly avers that Defendant was questioned by the officers, Defendant does not identify any specific questioning by the officers. Rather, Defendant testified that, prior to Agent Fyffe's arrival, no officers attempted to question Defendant regarding what was on his cell phone. Tr. 116:3–9. Though Agent Fyffe spoke with Defendant upon his arrival, Defendant does not establish the contents of the interaction nor whether the interaction took place before Agent Fyffe informed Defendant of his *Miranda* rights. *Id.* at 6:18–7:20. Additionally, even if Agent Fyffe interrogated Defendant before Defendant received his *Miranda* warnings, Defendant does not identify a statement that Defendant seeks to suppress. Accordingly, the Court denies Defendant's request to suppress any statements following the initial discovery of the suspected child pornography. *See de la Fuente*, 548 F.2d at 534 ("[T]he defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality.").

## IV. CONCLUSION

In sum, the Court determines that suppression of the contents of Defendant's cell phone is inappropriate. First, the initial search of Defendant's cell phone by Officer Saucedo in secondary inspection was lawful because Defendant voluntarily consented to the search. Second, the

subsequent searches of Defendant's cell phone after he was placed in the holding cell were supported by at least reasonable suspicion and were therefore lawful pursuant to the border search exception. Alternatively, suppression of the fruits of the subsequent searches is inappropriate because the good faith exception to the exclusionary rule applies. Finally, regarding Defendant's Fifth Amendment claim, Defendant fails to identify any specific statement made in response to any specific interrogation; thus, the Court denies Defendant's broad motion to suppress pursuant to the Fifth Amendment.

Accordingly, **IT IS ORDERED** that Defendant Ricardo Ramirez, Jr.'s "Motion to Suppress Evidence" (ECF No. 31) is **DENIED**.

SIGNED this _1st_ day of _August_, 2019.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE